Murrell L. JACK, Plaintiff,

v.

Kenneth S. APFEL,[1] Commissioner
of Social Security, Defendant.

No. 3–96–CV–90194.

United States District Court,
S.D. Iowa,
Davenport Division.

Oct. 14, 1997.

Michael DePree, Davenport, IA, for Plaintiff.

Christopher D. Hagen, Asst. U.S. Atty., Des Moines, IA, for Defendant.

PRATT, District Judge.

Plaintiff, Murrell L. Jack, filed a Complaint in this court on December 11, 1996, seeking review of the Commissioner's decision to deny her claim for Supplemental Security Income benefits under Title XVI of the Social Security Act. 42. U.S.C. § 1381 (1994). This court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff filed an application for disability benefits on September 22, 1993[2]. Her application was denied initially and upon reconsideration. After a hearing, Administrative Law Judge John P. Johnson (ALJ) issued a

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.

2. Plaintiff filed an earlier application on December 17, 1992. The ALJ declined to reopen this application.

decision on February 15, 1996, denying benefits. On October 25, 1996, the Appeals Council denied Plaintiff's request for review. Plaintiff filed this Complaint on December 11, 1996.

## STANDARD OF REVIEW

When reviewing a denial of benefits, we will uphold the Secretary's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir.1991). Substantial evidence is that which a reasonable mind might accept as adequate to support the Secretary's conclusion. *Whitehouse,* 949 F.2d at 1006 (Citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). In assessing the substantiality of the evidence. we must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. *Locher,* 968 F.2d at 727 (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). We may not, however, reverse the Secretary's decision "merely because substantial evidence would have supported an opposite decision." *Id.* (quoting *Baker,* 730 F.2d at 1150). *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). In making this inquiry, a court should neither consider a claim de novo nor abdicate it's function to carefully analyze the entire record in conducting the review. *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

## ALJ'S FINDINGS

The ALJ, following the sequential evaluation found at 20 C.F.R. § 416.920, found that Plaintiff has not engaged in substantial gainful activity since 1993. The ALJ found that Plaintiff has severe impairments: obesity and a history of right knee arthroscopic surgery with complaints of pain; medically determinable impairments resulting in complaints of low back pain and neck and chest and arm pain; history of asthma; history of substance abuse with a history of depression, borderline intelligence, and a history of a learning disorder. The ALJ found that none of Plaintiff's impairments are severe enough to meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. at 31) The ALJ found:

> The claimant has the residual functional capacity to perform the requirements of work except for lifting of more than 25 pounds at a time on occasion, lifting and carrying of more than 15 pounds frequently, standing longer than one to two hours at a time, sitting longer than one to two hours at a time, walking more than one to two hours at a time, continuous bending or stooping, repetitive squatting or kneeling, repetitive crawling or climbing, exposure to extremes of heat or cold or humidity, work at unprotected heights, and other than simple, routine, repetitive work not requiring close attention to detail, more than occasional contact with the public, greater than a regular work pace, more than mild to moderate amounts of stress, or work which does not provide occasional supervision. (20 C.F.R. § 416.945)

At the fourth step of the sequential evaluation, the ALJ found that Plaintiff is unable to do her past relevant work as a nurse's aide or a concession worker. (Tr. at 32) At the fifth step, the ALJ found that there are unskilled jobs in the national economy for which Plaintiff has the residual functional capacity. (Tr. at 33) The ALJ, as required. attached a Psychiatric Review Technique Form (PRTF) to the Notice of Decision. (Tr. at 34–43). This form indicates, among other things, that Plaintiff often has "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)." (Tr. at 42)

## DISCUSSION

Plaintiff argues that the finding on the PRTF, regarding deficiencies of concentration, persistence or pace, should have been included in the hypothetical question that was put to the vocational expert at the administrative hearing. Plaintiff argues that the omission renders the hypothetical fatally deficient, and that the Decision, therefore, is not supported by substantial evidence on the record as a whole. In support of this argument, Plaintiff cites *Newton v. Chater,* 92 F.3d 688 (8th Cir.1996). Defendant argues

that the case should be controlled by *Roe v. Chater*, 92 F.3d 672 (8th Cir.1996) which holds that a hypothetical question is sufficient if it captures the concrete consequences that flow from a claimant's impairments.

It is well settled 8th Circuit case law that, having found Plaintiff is unable to do her past relevant work, the burden of proof shifted to the Commissioner to come forward with medical evidence to prove Plaintiff has a residual functional capacity for other work, and that other work exists in significant numbers in the national economy that such a person is able to do. *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir. 1982) (en banc); *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir.1983); *Soth v. Shalala.* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993). It is also well settled law that in order to meet the second prong of the Commissioner's burden, in cases where referral to the medical vocational guidelines (Grid) is inappropriate, the ALJ must rely on the testimony of a vocational expert in response to a hypothetical question which precisely sets out the claimant's impairments and limitations. *Ness v. Sullivan.* 904 F.2d 432, 436 (8th Cir.1990).

If the Court could find support in the medical records of the treating and examining physicians for the limitations on the PRTF, the Court would agree with Plaintiff that those limitations need to be included in a hypothetical question. It stands to reason that if Plaintiff's impairments cause failure, to complete tasks in a timely manner, such a limitation should be considered by the vocational expert when determining whether competitive work is possible. "Employers are concerned with substantial capacity, psychological stability, and steady attendance." *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980). Since residual functional capacity is a medical question (*Ford v. Secretary of Health and Human Services*, 662 F.Supp. 954, 955 (W.D.Ark.1987)), the Court has very carefully reviewed the medical evidence in this record.

Plaintiff was seen, on two occasions, by D.K. Mokhtar, D.O. for physical examinations. The first examination was January 10, 1994. (Tr. at 213–218). The second examination was December 29, 1994. (Tr. at 252–259). After each examination, Dr. Mokhtar opined:

> She should not lift in excess of 25 lbs. Occasionally and 10—15 lbs. frequently in an eight hour shift. She should alternate every 1–2 hours with standing, walking and sitting in an eight hour shift. She may do occasional stooping, climbing, kneeling and crawling. She has good dexterity and no problem with corrected vision, hearing, speaking and traveling. She should have not (sic) problem with occasional exposure to dust and fumes, She should avoid extreme temperature changes due to joint aches, low back pain, asthma and angina.

(Tr. at 255 and 216). After the January 10 examination, the doctor did not make the reference to asthma and angina, otherwise the two statements are identical.

In September, 1989, Plaintiff was seen at the University of Iowa Hospitals and Clinics for multiple dislocations of her right patella. (Tr. at 291) The report of examination states: "By examination today we do not find physical evidence to correspond with the symptoms of dislocations both medially and laterally in fact the most recent episode by her report was two days ago dislocating medially and she is completely nontender about the parapatellar area today." (*Id.*). Nevertheless, on January 11, 1990, Plaintiff underwent an arthroscopic examination with a partial lateral menisectomy, femoral condyle chondral debridement. (Tr. at 295). On January 23, 1990, Plaintiff was told she did not need to wear her knee immobilizer and that she was to wean herself out of the crutches over the next week. (Tr. at 296). The last visit for the knee problem was February 20, 1990, at which time improvement was noted. (Tr. at 297).

On January 1, 1994, Plaintiff was seen at the emergency room, complaining of pain in her left hip, after she fell on the ice. Right hip films were negative for fracture. (Tr. At 211).

On August 6, 1994, Plaintiff was seen again at the University of Iowa for chest pain and a syncopal episode. (Tr. at 298). After an examination. Allyn Mark, M.D. wrote: "... Her negative graded exercise test today sug-

gests no cardiac ischemia, and certainly even less evidence for a significant disease such as left main or three-vessel disease. This chest pain is unlikely due to cardiac origin ..." (Tr. At 299). On August 11, 1944, Dr. Mark wrote that because the treadmill test was normal, and because Plaintiff's pain was not entirely typical for angina pectoris, he decided not to proceed with further evaluations. (Tr. at 322). Plaintiff was seen once again by Dr. Mark on August 22, 1995. Dr. Mark wrote that Plaintiff was a healthy-appearing, overweight, young woman. and that the examination of the neck, lungs and heart were normal. Dr. Mark wrote that he still doubted the diagnosis of coronary artery disease or cardiac ischemia, although he thought it possible that she has coronary spasm. The doctor ordered a 48 hour Holter monitor study. (Tr. at 354). Dr. Mark noted that during the visit to the clinic, Plaintiff had an episode of chest pressure that was relieved by nitroglycerin. A electrocardiogram obtained immediately thereafter was negative. (Tr. at 355). The report of the Holter monitor states: "The recording demonstrates sinus rhythm with rare, isolated PAC's. During patient reports of 'light-headedness' the rhythm was sinus without ectopy." (Tr. at 357).

On July 18, 1995, Plaintiff was seen for an episode of asthma. It seems she was "observing a fire of significant size in Bettendorf when she began to wheeze." Plaintiff was treated, at the scene of the fire, by paramedics. By the time she was seen at the emergency room, she was asymptomatic. (Tr. at 341).

On September 27, 1995, Plaintiff was seen by Robert Schultes, M.D. for her asthma. Dr. Schultes observed: "No acute distress, lungs clear to auscultation. Heart NSR [normal sinus rhythm] without murmur. Walking normally and smiling." (Tr. at 363). On September 28, 1995, Plaintiff underwent an upper GI study at Genesis Medical Center. Andrew E. Berkow, M.D. wrote: "The distal esophagus, stomach, duodenal bulb, duodenal sweep and proximal loops of the small bowel appear normal." (Tr. at 365) On October 11, 1995, Plaintiff saw Dr. Schultes because she had an episode of chest pain the previous night. The second Nitroglycerin pill relieved the pain after five minutes.

Plaintiff had no other symptoms. Plaintiff's lungs were clear to auscultation and percussion. Her heart had a normal spontaneous rhythm with no murmur. (Tr. a 366). An X-ray taken on October 12, 1995, revealed normal heart, lungs and bony structures. (Tr. at 367). On October 17, 1995, Plaintiff underwent an echocardiographic study. Plaintiff's left ventricular function was good and she had no valve regurgitation. A repeat study and clinical correlation were recommended to better define a "density in the left atrium." (Tr. at 369). Plaintiff was seen for one more evaluation by Dr. Mark on November 21, 1995. A "cine cardiac CT scan" revealed no left atrial abnormality. It also revealed good left ventricular function. Her right ventricular function was borderline normal but Dr. Mark wrote that he did not think this was a real concern in Plaintiff. Plaintiff was not given a return appointment. (Tr. at 9).

We turn now to a discussion of Plaintiff's mental impairments. On January 17, 1995, Kedar N. Bhasker, M.D. wrote a report for Disability Determination Services regarding Plaintiffs treatment at Vera French Community Mental Health Center. Plaintiff was first seen on February 8, 1994. Plaintiff complained of suicidal ideation and feeling depressed, anxious and irritable due to severe marital difficulties. Plaintiff had been married two months previous, after which her husband had become verbally and physically abusive. Plaintiff did not return to the Center until November 4, 1994, when she reported that she had been separated from her husband since February. Plaintiff said that she was again feeling suicidal. She admitted to sleep and appetite difficulties. Plaintiff said: "I've really been down on myself. I need help to gain control to stay away from both booze and drugs." (Tr. at 260). Plaintiff reported a history of alcoholism since age 3 with both in patient and out patient treatment programs. Her affect and mood reflected depression. Plaintiff saw Dr. Bhasker on November 1, 1994 at which time she did not appear to be depressed. Plaintiff had used illegal drugs the month before, and alcohol three weeks before the evaluation. The diagnosis was substance abuse disorder with mixed features. Plaintiff was pre-

scribed medication and referred to the Center for Alcohol and Drug Services. On November 14, 1994, Plaintiff called the Center to report a rash. When she was seen by Dr. Bhasker, he could not see any rash but he replaced the Doxepin, which he had prescribed, with Trazedone. A return appointment was made, but Plaintiff did not return to the Center. Because of the length of time since he had seen Plaintiff, and because of the brevity of his contact, Dr. Bhasker did not complete a functional assessment, nor did he make any comment on Plaintiff's ability to function. (Tr. at 261).

Plaintiff was seen by Eric Bruster, Psy.D. for a psychological evaluation on May 3, 1994. Plaintiff described herself as a recovered drug addict, but did admit to drinking beer the day before the evaluation. (Tr. at 231). The only psychological test administered was the Wechsler Adult Intelligence Scale–Revised, which showed a verbal IQ of 77, a performance IQ of 78, and a full scale IQ of 77. (Tr. P.232). Dr. Bruster wrote that the borderline IQ was consistent with Plaintiff's prior academic achievements and would impact and impair her vocational functioning. Dr. Bruster pointed out that Plaintiff would have problems understanding and carrying out instructions or procedures. Dr. Bruster pointed out that Plaintiff's bad temper could affect her ability to interact appropriately with supervisors or co-workers. "Finally," wrote Dr. Bruster:

I think that her ability to exercise good judgment and respond appropriately to changes in the workplace is deficient, to the extent that I would foresee problems with this individual working in a semistressful environment where decision have to be made quickly—decisions that could affect the health and wellbeing of others. I think this woman is depressed and could have some organic etiology to her Mood Disorder and/or may have features of a Personality Disorder. Psychological testing may be useful for clarifying diagnostic impressions. I would recommend that she see a physician to determine if there is a need for medication to treat her depression. I would also recommend that she receive psychotherapy to help support her adjustment in coping during what surely is a difficult time in her life. i.e. going through a divorce and considerable financial problems.

(Tr. at 233–234). On June 14.1995, more than a year after she saw, Dr. Bruster, and after Plaintiff had the above noted treatment at the Vera French Mental Health Center, Plaintiff saw D.V. Domingo, M.D. for a psychiatric evaluation. (Tr. at 324–329). Under the heading Mental Status Examination, Dr. Domingo wrote: "She was cooperative, coherent with a good attitude and is not depressed. Her affect is appropriate and mood is neutral." (Tr. at 325). Dr. Domingo's diagnosis, on Axis I, was: 1) History of recurrent depression, *in remission.* 2) Rule out organic affective disorder, depressed versus situational depression, *in remission.* 3) History of alcoholism, *in remission.* 4) History of polydrug abuse, *in remission.* (Emphasis added). (Tr. at 325). Dr. Domingo also submitted a Medical Assessment Of Ability To Do Work–Related Activities (Mental), a form supplied by the Social Security Administration. (Tr. at 327–328). Dr. Domingo marked all of the areas as being "Fair". The definition for "fair", according to the form, is: "Ability to function in this area is seriously limited, but not precluded." (Tr. at 327).

It is the holding of the Court that the residual functional capacity finding made by the ALJ is supported by substantial evidence on the record as a whole. The physical residual functional capacity is supported by the evaluations and opinion of Dr. Mokhtar as well as by the evidence from the University of Iowa and the other treating sources discussed above. This part of the finding is not challenged by Plaintiff. The mental aspects of the residual functional capacity are supported by the medical evidence discussed above. Plaintiff is receiving no mental health care. She sought treatment for a very brief period of time and did not follow up as recommended. Although psychotropic medication was prescribed, Plaintiff did not take it for any period of time. At the time of the hearing, she was on no psychotropic medication (Tr. at 285 & 104). and none was reported in any of the consultative examinations. Although the examination by the psychologist, Dr. Bruster, indicated depression and the need for a psychiatric or psychologi-

cal evaluation, by the time Plaintiff was seen by Dr. Domingo, all of her mental health impairments were "in remission". Furthermore, Dr. Domingo stated, point blank: "She ... is not depressed." (Tr. at 325) Although Dr. Domingo said Plaintiff was seriously limited on the mental residual functional capacity form, the form does not comport with his diagnostic impression. The fact that *all* of the areas are checked "seriously limited", leads the Court to believe that the doctor completed the form in a perfunctory manner. If Plaintiff suffered from a diagnosable mental disorder, the Court would hold that the serious limitations, like the moderate limitations on the Mental Residual Functional Capacity Assessment form (e.g. Tr. at 235–238), and the limitation of "Often" on item number 3 on Part B of the PRTF, would be evidence which detract from the substantiality of the evidence supporting the ALJ's decision. *Edleman v. Shalala,* 845 F.Supp. 1337 (S.D.Iowa 1994). In this case. however, the finding on the ALJ's PRTF is not supported by substantial evidence on the record as a whole. The ALJ's decision that Plaintiff has a residual functional capacity for unskilled work, is supported by substantial evidence on the record as a whole. The Commissioner met his burden of proving, with medical evidence, that Plaintiff has a residual functional capacity for work. and that work exists that can be done by a person with Plaintiffs residual functional capacity.

Plaintiff's Motion To Reverse The Commissioner is denied. The Commissioner's Motion To Affirm is granted.

The decision of the ALJ, which became the final decision of the Commissioner, is affirmed.